**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:10-cr-00066

HEYWOOD SMITH IV,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Heywood Smith IV's Motion to Dismiss Counts 1 and 2 of the Indictment [Docket 23]. For the reasons set forth below, the Motion is **DENIED**.

*I. BACKGROUND*

On April 13, 2010, the grand jury returned a two-count indictment against Defendant, Heywood Smith IV, charging him with possessing a firearm after a misdemeanor domestic violence conviction, in violation of 18 U.S.C. § 922(g)(9). (Docket 2 at 1.) Count One alleges Defendant knowingly possessed a Ruger 9 millimeter pistol in and affecting interstate commerce on March 24, 2009. Count Two alleges Defendant knowingly possessed a Smith and Wesson .40 caliber pistol in and affecting commerce on July 2, 2009.

To be charged with violating § 922(g)(9), Defendant must have a predicate misdemeanor domestic violence conviction. On March 13, 2002, a criminal complaint was filed against Defendant in Wood County Magistrate Court, charging him with misdemeanor domestic battery in violation of W. Va. Code § 61-2-28(a). The investigating officer on that charge discovered Defendant in the

apartment of his girlfriend, Teresa Montgomery.  Montgomery reported, and a witness corroborated, that Defendant struck and choked her before police responded to the scene.  At the time, Defendant was already "out on bond on a domestic battery charge involving Teresa Montgomery," a condition of which was to avoid contact with Montgomery.  On June 26, 2002, Defendant entered a plea of guilty to domestic battery stemming from the March 13 incident.  He was sentenced to 90 days in jail.  (Docket 25 at 3.)

Seven years later, on March 24, 2009, Charleston Police Officers again responded to a domestic disturbance involving Defendant.  On this occasion, Defendant was arguing with his wife, Latasha Dedrick, and her mother, father, and step-father.  When the first officer arrived on the scene, he was informed that Defendant had brandished a firearm at Ms. Dedrick's father in the course of a verbal altercation.  Investigating that information, the officer encountered Defendant emerging from the couple's residence carrying a black plastic trash bag.  The officer informed Defendant of the information he received, and the officer performed an investigative stop and pat down. Defendant then volunteered that a firearm was in the trash bag he carried.  Police discovered a loaded 9 millimeter Ruger pistol in the bag.  (Docket 25 at 4-5.)  After police corroborated the information they received with multiple witnesses, Defendant was placed under arrest and charged with brandishing a deadly weapon in violation of W. Va. Code § 61-7-11, carrying a deadly weapon in violation of W. Va. Code § 61-7-3, and carrying a firearm in violation of W. Va. Code § 61-7-7. (Docket 20 at 20-21.)

Count Two of the indictment originates from a traffic stop at approximately 2:00 a.m. on July 2, 2009.  After pacing Defendant's car for several blocks and determining that Defendant was exceeding the posted speed limit, two Charleston Police Officers initiated a traffic stop.  In the

course of the stop, the officers recovered a loaded Smith and Wesson .40 caliber pistol and a large knife from the car's glove compartment. The pistol was previously reported stolen. (Docket 39 at 3-4.) Defendant was placed under arrest and charged with carrying a concealed weapon in violation of W. Va. Code § 61-7-3 and carrying a firearm in violation of W. Va. Code § 61-7-7. The Court also notes that Defendant was arrested for a third domestic battery offense in violation of W. Va. Code § 61-2-28(d) in January 2010. Section 61-2-28(d) makes a third domestic battery a felony offense. (Docket 20 at 5-10.)

Defendant was later charged with violating 18 U.S.C. § 922(g)(9), which provides, in pertinent part: "It shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence . . . to . . . possess . . . any firearm . . . ." In the current motion, Defendant contends that 18 U.S.C. § 922(g)(9) violates his Second Amendment right to keep and bear arms. Defendant also challenges the statute on its face, arguing it is overbroad, irrational, vague, and unconstitutional under any form of heightened scrutiny.

## II.  APPLICABLE LAW

Pursuant to Fed. R. Crim. P. 12(b)(3)(B), the district court may, at any time during the pendency of a case, hear a defendant's claim that an indictment fails to state an offense or is otherwise defective. *See In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883). An indictment is defective if it charges a violation of an unconstitutional statute. *See United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). Upon a finding that an indictment is defective, the district court must dismiss the indictment.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms,

3

shall not be infringed."  U.S. Const. Amend. II.  Until recently, the Second Amendment was interpreted as a collective right, connected with service in an official state militia, rather than a free-standing, individual right of the citizenry.  *E.g.*, *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995) ("[T]he Second Amendment only confers a collective right of keeping and bearing arms which must bear a 'reasonable relationship to the preservation or efficiency of a well-regulated militia'" (citing *United States v. Miller*, 307 U.S. 174, 178 (1939)).

Such collective rights interpretations were wholly rejected by the Supreme Court in *District of Columbia v. Heller*. 554 U.S. ___, 128 S. Ct. 2783 (2008).  In *Heller*, the Court held that the Second Amendment secures an individual right to keep and bear arms, and that a local law "generally prohibiting the possession of handguns" by all persons within the District of Columbia was unconstitutional in light of that individual right.  *Id.* at 2799, 2821-22.  In reaching its conclusion, the Supreme Court conducted a historical inquiry into the meaning of the Second Amendment's text.  *See id.* at 2801-02.  The Court held that, while the Second Amendment refers to the right to keep and bear arms both individually ("the right of the people to keep and bear Arms") and in relation to militia service ("a well regulated Militia"), the "core" of the Second Amendment's protections was "the right of law-abiding, responsible citizens to use arms in the defense of hearth and home."  *Id.* at 2818, 2821.

Notably, despite its lengthy analysis of the Second Amendment's history and text, the *Heller* Court declined to announce the appropriate level of constitutional scrutiny for review of the firearms restriction at issue in that case.  *See id.* at 2821 (acknowledging the dissent's criticism of the majority for failing to announce a level of scrutiny). Instead, the Court found that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the ban at issue

4

"would fail constitutional muster." *Id.* at 2817-18.  The Supreme Court did, however, rule out two levels of "means-end" scrutiny as inappropriate for Second Amendment analysis.  First, it held that rational basis review was improper because the extent to which the legislature may regulate specific, enumerated rights in the Bill of Rights requires more exacting scrutiny.  *Id.* at 2817 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").  Second, the majority rejected the novel "interest-balancing approach"[1] devised by Justice Breyer in dissent.  *Id.* at 2821 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest balancing' approach.").  Beyond eliminating rational basis and Justice Breyer's "interest-balancing approach," however, the Court gave no clear guidance to lower courts regarding the appropriate level of scrutiny applicable to firearms restrictions in the wake of its *Heller* decision.

Perhaps the most important strand of the *Heller* opinion for purposes of this motion was the Supreme Court's caution to lower courts that its decision not be interpreted so broadly as to invalidate all existing firearms regulation.  *Id.* at 2816-17.  Instead, recognizing that "the right secured by the Second Amendment is not unlimited," *id.* at 2816, the Court identified a number of "longstanding prohibitions on the possession of firearms," derived from various historical provisions, as "presumptively lawful regulatory measures."  *Id.* at 2816-17 & n.26.  Among the longstanding prohibitions that the Court found presumptively lawful were those on the possession of firearms by felons, mentally ill individuals, and minors, as well as "laws forbidding the carrying

---

[1]  Justice Breyer's proposed "interest balancing inquiry" asks "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests."  *Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting).

of firearms in sensitive places . . . or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-17.  Expanding on this principle, the Court noted that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2817 n.26.

The Supreme Court, thus, identified a non-exclusive, illustrative list of constitutionally permissible restrictions on the Second Amendment, but declined to clarify the class of appropriate restrictions other than "longstanding prohibitions" on the right to keep and bear arms.  This uncertainty has led to a raft of litigation concerning the intersection of the individual right to keep and bear arms as defined by *Heller* and various firearms restrictions, 18 U.S.C. § 922(g) among them.  While certain subsections of § 922(g) fall squarely within the presumptively lawful measures announced in *Heller* (for example, § 922(g)(1) precludes convicted felons from possessing a firearm, and § 922(g)(4) prohibits anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" from the same), the subsection at issue in this case–§ 922(g)(9)–does not.  The Supreme Court in *Heller* made no mention of domestic violence misdemeanants.

This Court is not the first to be presented with this specific issue.  In resolving the tension between the individual right to keep and bear arms guaranteed by the Second Amendment and the restriction on domestic violence misdemeanants contained in § 922(g)(9), courts have taken essentially two approaches.  Some courts have found § 922(g)(9) presumptively constitutional because it is so similar to the restriction on firearms possession by convicted felons contained in § 922(g)(1), a restriction expressly upheld by the Supreme Court (albeit in dictum).  *See, e.g.*, *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010); *United States v. Holbrook*, 613 F. Supp. 2d

6

745, 776 (W.D. Va. 2009); *United States v. Booker*, 570 F. Supp. 2d 161, 163-64 (D. Me. 2008);

*United States v. Luedetke*, 589 F. Supp. 2d 1018, 1022-23 (E.D. Wis. 2008); *United States v. White*,

No. 07-00361, 2008 WL 3211298 at *1 (S.D. Ala. Aug. 6, 2008).  A growing number of courts have

declined to follow this line of analysis, however, criticizing it as cursory and insufficient.  *See, e.g.*,

*United States v. Chester*, 367 F. App'x 392, 398 (4th Cir. 2010) (unpublished opinion); *see also*

*United States v. Tooley*, No. 3:09-00194, 2010 WL 2380878 at *6 (S.D. W. Va. July 14, 2010);

*United States v. Miller*, 604 F. Supp. 2d 1162, 1170-72 (W.D. Tenn. 2009); *United States v.*

*Engstrum*, 609 F. Supp. 2d 1227, 1231-34 (D. Utah 2009).  The second approach requires individual

analysis of the statutory section at issue, a determination of the appropriate level of constitutional

scrutiny to be applied, and careful scrutiny of the statute in light of the facts before the court.  *See,*

*e.g.*, *Tooley*, 2010 WL 2380878, at *6.

   Several courts in this circuit have recently agreed with the second approach.  This is due to

the unpublished opinion of the Fourth Circuit Court of Appeals in *United States v. Chester*,  which

adopted a (now vacated) panel opinion from the Seventh Circuit.  *See United States v. Skoien*.  587

F.3d 803 (7th Cir. 2009), *vacated and remanded*, No. 08-2770, 2010 WL 2735747 (7th Cir. July 13,

2010) (en banc).  While neither the holding of *Chester* (because it is an unpublished opinion) nor

the en banc decision in *Skoien* is binding on this Court, these recent developments regarding the

appropriate mode of analysis by which to assess § 922(g)(9) warrant further discussion.

   In *Chester*, the Fourth Circuit embraced the panel decision in *Skoein*, which propounded a

two-part test for determining the constitutionality of firearm restrictions that fall outside the specific

exceptions enumerated in *Heller*.  *Chester*, 367 F. App'x at 397.  The *Skoein* panel stated:

> First, some gun laws will be valid because they regulate conduct that falls outside the
> terms of the right as publicly understood when the Bill of Rights was ratified.  If the

government can establish this, then the analysis need go no further.  If, however, a law regulates conduct within the scope of the right, then the law will be valid (or not) depending on the government's ability to satisfy whatever level of means-end scrutiny is held to apply; the degree of fit required between the means and the end will depend on how closely the law comes to the core of the right and the severity of the law's burden on the right.

587 F.3d at 808-09 (citation omitted).  The first part of this test was derived from the language in *Heller* reaffirming "longstanding prohibitions on the possession of firearms."  *See Heller*, 128 S. Ct. at 2816-17.  The second part of the test is derived from the language in *Heller* establishing the "core" of the right to keep and bear arms as that of "law-abiding, responsible citizens to use arms in the defense of hearth and home."  *Id.* at 2821.  In short, the first step places the specific statute at issue in historical context, asking whether its regulation infringes on activity that falls within the scope of the Second Amendment's protections in the first place; if it does, the second step asks whether the conduct at issue is part of the "core" of the Second Amendment's guarantee and applies some level of "means-ends" scrutiny to establish whether the regulation passes constitutional muster. As did the *Skoien* panel, the Fourth Circuit in *Chester* rejected the analogy approach employed below and instructed the district court to "conduct an analysis of the constitutional validity of § 922(g)(9) which is 'independently justified,'" and to "identify, justify, and apply the appropriate level of scrutiny."  *Chester*, 367 F. App'x at 398.

Shortly after *Chester* was decided, the *Skoien* panel decision on which the Fourth Circuit so heavily relied was vacated for rehearing en banc by the Seventh Circuit.  The en banc opinion did not employ the two-step approach that the panel announced and *Chester* endorsed.  Instead, without deciding the question of whether those convicted of misdemeanor domestic violence were outside the scope of the Second Amendment as understood at the founding, the court held that "some categorical disqualifications [on firearm possession] are permissible."  *Skoien*, 2010 WL 2735747,

8

at *3.  To be permissible, the court held, "some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and . . . § 922(g)(9) is valid only if substantially related to an important government objective."  *Id.*  In summary, then, the en banc decision in *Skoein* wiped clean the two-part test announced in the Seventh Circuit panel decision, and instead approved of what appeared to be intermediate scrutiny as the appropriate "means-ends" standard to apply to § 922(g)(9).  Further, it did so without inquiring into the scope of the Second Amendment as historically understood.  The thrust of *Heller*'s caution that "the right secured by the Second Amendment is not unlimited," *Heller*, 128 S. Ct. at 2816, as interpreted by the Seventh Circuit sitting en banc, was that categorical bans on firearm restrictions are permissible if they pass constitutional muster, regardless of the Second Amendment's pedigree and the founders' understanding of the right to keep and bear arms.  *See Skoien*, 2010 WL 2735747, at *3. ("[W]e . . . take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791.").

Most recently, the approach adopted in the *Skoien* en banc opinion was affirmed in *United States v. Williams*, No. 09-3174, 2010 WL 3035483, at *7 (7th Cir. Aug. 5, 2010) (O'Connor, J., sitting by designation).  In *Williams*, the defendant challenged his conviction under the felon in possession statute, § 922(g)(1),[2] as constitutionally impermissible, arguing that because he was utilizing his handgun for self-defense in his home—the "core" Second Amendment right under *Heller*—the regulation impugned on his right to keep and bear arms.  *Id.* at *5.  As it had in its

---

[2]  Section 922(g)(1) states: "It shall be unlawful for any person ... who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year ... to ... possess ... any firearm or ammunition."

*Skoien* en banc opinion, the Seventh Circuit refrained from considering the scope of the Second Amendment's protections at the time of the founding, simply stating "whether felons were excluded from firearm possession at the time of the founding is 'inconclusive at best.'" *Id.* at *6 (citing *Skoien*, 2010 WL 2735747, at *11 (Sykes, J., dissenting)). Instead, following the en banc majority's holding from *Skoien*, the court in *Williams* acknowledged the viability of categorical bans on firearm possession and applied intermediate scrutiny to the § 922(g)(1) ban at issue there. *Id.* ("[W]e . . . examine [the defendant's] claim using the intermediate scrutiny framework . . . .").

Finally, in a recent case from this district, Judge Chambers found the reasoning in *Chester* persuasive and undertook a historical analysis of the Second Amendment to determine the proper level of constitutional scrutiny. *Tooley*, 2010 WL 2380878, at *6. Although the court was without the en banc opinion in *Skoien* and the Seventh Circuit's later *Williams* opinion, it ultimately applied intermediate scrutiny to the defendant's constitutional claims against § 922(g)(9). *See id.* at *12. In reaching this conclusion, the district court employed the two-part test from the *Skoien* panel decision:

> To determine an appropriate level of review, this Court will engage in a historical analysis of the Second Amendment as it would apply to 18 U.S.C. § 922(g)(9) and Mr. Tooley's circumstances. This review could result in three possibilities: 1) a finding that a restriction of firearms under § 922(g)(9), as applied to Mr. Tooley, is completely outside the historical protections offered by the Second Amendment, in which case the statute would be constitutional [without more]; . . . 2) a finding that 18 U.S.C. § 922(g)(9), as applied to Mr. Tooley, is within the "core" of the Second Amendment right "to keep and bear arms"—in which case the restriction would most likely be subject to exacting scrutiny; or 3) a finding that . . . the Second Amendment extends to some of those affected by § 922(g)(9), including Mr. Tooley, but that its protections are outside the "core" of the right—in which case lesser review than strict scrutiny would most likely be appropriate.

*Id.* at *6 (internal citation omitted). First, as to the historical pedigree of § 922(g)(9) and the Second Amendment, the district court held that, although criminals and those posing a danger to the public

were historically at risk of losing the right to bear arms in the colonial England and America, a domestic violence misdemeanant is not beyond the scope of the Second Amendment's protection altogether. *Id.* at \*11-12. Second, the court held that the defendant in *Tooley* was several steps removed from the "core" of the Second Amendment's protections as defined in *Heller*, and, as such, he was not entitled to strict scrutiny review. *Id.* Applying intermediate scrutiny to § 922(g)(9) as applied to the defendant, the court in *Tooley* found the restriction constitutional. *Id.* at \*17.

## III. DISCUSSION

These recent developments concerning the intersection of the Second Amendment and federal restrictions on firearms possession leave the current landscape less than perfectly clear. Relying heavily on the *Skoien* panel opinion, *Chester* informed us that justifying § 922(g)(9) by analogy to *Heller*'s list of presumptively lawful regulations, without more, is impermissible. However, as set forth above, the *Skoien* panel opinion was recently vacated, and the Seventh Circuit's en banc opinion never denounced the constitutional-by-analogy approach that pervaded prior to the *Skoien* panel's decision. *Chester*'s underpinnings are thus questionable, and only one court in the Fourth Circuit has addressed *Chester* since the *Skoien* en banc decision was handed down.[3] For that reason, and because it finds the analogy compelling, this Court holds that § 922(g)(9) is presumptively lawful by analogy to the restriction on felony firearm possession found presumptively lawful in *Heller*. In the alternative, this Court holds that intermediate scrutiny is the

---

[3] *Tooley* was decided after the Seventh Circuit granted rehearing en banc and vacated the panel decision, but prior to the en banc decision. *See Tooley*, 2010 WL 2380878, at \*6. However, in early September 2010, District Judge Copenhaver decided *United States v. Staten*, No. 2:09-cr-235, 2010 WL 3476110 (S.D. W. Va. Sept. 2, 2010), which the Court finds instructive. Like this Court, the court in *Staten* noted that the holding in *Chester* is uncertain in light of the en banc Skoien opinion. *Id.* at \*3.

appropriate standard of review, and that § 922(g)(9) independently passes constitutional muster under that standard.

A. *The Firearms Restriction in § 922(g)(9) Is Presumptively Lawful by Analogy to § 922(g)(1) and Lawful Regulations Found in* Heller

In the wake of *Heller*, most courts considering motions to dismiss indictments charging violations of § 922(g)(9) relied on the "presumptively lawful regulatory measures" language in *Heller*, analogizing § 922(g)(9) to § 922(g)(1). *See, e.g.*, *United States v. Holbrook*, 613 F. Supp. 2d 745, 776 (W.D. Va. 2009); *United States v. Booker*, 570 F. Supp. 2d 161, 164-65 (D. Me. 2008) ("[P]ersons who have been convicted of a misdemeanor crime of domestic violence must be added to the list of 'felons and the mentally ill' against whom the 'longstanding prohibitions on the possession of firearms' survive Second Amendment scrutiny.") (quoting *Heller*, 128 S. Ct. at 2816-17). Accordingly, those courts decided that the statutory prohibition against the possession of firearms by persons convicted of the misdemeanor crime of domestic violence warranted inclusion on *Heller*'s list of presumptively lawful longstanding prohibitions. For the reasons below, this Court agrees and holds that § 922(g)(9) is presumptively lawful by analogy to § 922(g)(1).

Section 922(g)(1) was enacted as part of the Gun Control Act of 1968, which sought to "keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency." *Barrett v. United States*, 423 U.S. 212, 220 (1976) (quoting S. Rep. No. 90-1501, at 22 (1968)). This goal was accomplished by proscribing gun ownership to certain classes of individuals, among them convicted felons and the mentally infirm. *See United States v. Bass*, 404 U.S. 336, 345 (1971). In 1996, Congress amended § 922(g) to encompass a prohibition on firearm possession by domestic violence misdemeanants. This amendment was based on the realization that domestic felonies are notoriously difficult to prove, frequently resulting in

12

misdemeanor pleas and convictions instead. *See* 142 Cong. Rec. S10377-78 (1996) ("[V]iolent acts classified as 'misdemeanors' in a domestic context would often 'be considered felonies if committed by strangers.'"). Congress saw its amendment as closing a loophole that had developed in the Gun Control Act, and it adapted the law to serve the law's original purpose—"to keep firearms out of the hands of presumptively 'risky people.'" *Tooley*, 2010 WL 2380878, at *13 (quoting *Bass*, 404 U.S. at 345). In sum, § 922(g)(9) was passed "to deal with the failure of felon-in-possession laws to keep firearms out of the hands of violent domestic abusers," *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010), and, as such, § 922(g)(9) should be treated similarly to § 922(g)(1).

It is generally accepted that offending society by committing a crime leads legitimately to the loss of certain rights, such as the right to vote or serve on a jury. *See, e.g.*, 18 U.S.C. § 921(a)(33)(B)(ii) (referring to restoration of certain civil rights and inferring that such rights are stripped by virtue of a conviction under Title 18); *see also Beecham v. United States*, 511 U.S. 368, 373 n.* (1994) (listing the right to vote and the right to serve on a jury among the federal civil rights lost upon felony conviction). Firearms prohibition is also such a forfeited right, *see, e.g.*, W. Va. Code § 61-7-7, and this rationale applies with equal force to the two classes of persons prohibited by these two statutes.

In comparing § 922(g)(1) and § 922(g)(9), several courts have added that there is greater reason to uphold § 922(g)(9) than the presumptively lawful § 922(g)(1). This assertion is based on the felon-dispossession statute's failure to distinguish between violent and non-violent felons. *See, e.g.*, *White*, 593 F.3d at 1206. As a result, individuals convicted of tax evasion or white collar crimes can be lawfully and permanently dispossessed of their right to keep and bear arms. In contrast, § 922(g)(9) requires that the defendant act violently toward a family member or domestic

13

partner, as demonstrated by the predicate domestic violence conviction.[4]  The definitional net of §
922(g)(9) is thus more narrowly crafted than that of § 922(g)(1), another compelling reason to
uphold § 922(g)(9) by analogy to § 922(g)(1).

In sum, although it acknowledges the Fourth Circuit's limited guidance in *Chester*, this Court
finds the "prohibition via analogy approach" persuasive.  The Supreme Court in *Heller* expressly
stated that its list of presumptively lawful restrictions on firearm possession was non-exhaustive.
128 S. Ct. at 2817 n.26.  In addition, because § 922(g)(9) was congressionally intended as an
extension of § 922(g)(1),[5] and because § 922(g)(9) is more narrowly tailored to reach violent
criminals, this Court finds the justification for the firearm prohibition found in § 922(g)(9) at least
as persuasive as the prohibition found in § 922(g)(1).  Therefore, § 922(g)(9) should be considered
presumptively lawful, and it is the opinion of this Court that the statute may be upheld on that basis
alone.

### B.  The Firearms Restriction in § 922(g)(9) Is Independently Constitutional

Alternatively, the Court will independently analyze the constitutional underpinnings of §
922(g)(9).  As another court in this circuit recognized, despite being non-binding on this Court and
of questionable weight in light of the *Skoein* en banc opinion, "*Chester* provides the clearest

---

[4]  The term "misdemeanor crime of domestic violence" is a defined term, requiring, without
exception, that the state law misdemeanor "has, as an element, the use or attempted use of physical
force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent,
or guardian of the victim, by a person with whom the victim shares a child in common, by a person
who is cohabitating with or has cohabitated with the victim as a spouse, parent, or guardian, or by
a person similarly situated to a spouse, parent, or guardian of the victim."  18 U.S.C. §
921(a)(33)(A)(I).

[5]  *E.g.*, *United States v. Hayes*, 555 U.S. ___, 129 S. Ct. 1079, 1082, 1085 n.5, 1087 (2009) (stating
that Congress' aim in enacting § 922(g)(9) was to extend the firearms prohibition in § 922(g)(1) to
include persons convicted of a misdemeanor crime of domestic violence).

indicator of how the Fourth Circuit would have district courts address the constitutionality of gun laws." *United States v. Brown*, No. 3:09-cr-339, 2010 WL 2105157, at *6 (E.D. Va. May 25, 2010). Therefore, in reliance on the Fourth Circuit's direction from *Chester*, the Court will "identify, justify, and apply the appropriate level of [means-ends] scrutiny." *Chester*, 367 F. App'x at 398.

However, before proceeding, it is necessary to address Defendant's argument that 18 U.S.C. § 922(g)(9) is not a "longstanding prohibition" because it was enacted in 1996. (Docket 25 at 26-32.)  Defendant apparently contends that domestic violence misdemeanants, therefore, are not outside the scope of the Second Amendment as historically understood.  The Court acknowledges that at the time of the founding and before, domestic violence was not regarded as a serious crime. *See Tooley*, 2010 WL 2380878, at *7 ("[D]omestic violence was not a separate criminal offense and was probably not even viewed as especially problematic in most circles during the Founding Era.") (citations omitted).  Consequently, there were few, if any, firearms restrictions imposed on domestic violence misdemeanants prior to the enactment of § 922(g)(9). *Id.* However, the Court also acknowledges the Government's argument that the crown, the colonies, and the early nation frequently disarmed those individuals perceived to be a danger to the public or individuals.  (Docket 39 at 10-12.)  There is even evidence that the founders understood the Second Amendment as limited to the virtuous members of society. *See, e.g.*, Address of Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 B. Schwartz, The Bill of Rights, A Documentary History 665 (1971) ("[N]o law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.") (cited in *Heller*).  In light of this conflicting evidence, the Court cannot conclude that Defendant is outside of the Second Amendment's protections altogether.  Instead, it is presumed

15

that Defendant's Second Amendment rights remain intact in some degree, and the only remaining question is: To what level of scrutiny is Defendant entitled?

*(1)  Intermediate Scrutiny Is the Most Appropriate Constitutional Standard*

Based on the Fourth Circuit's discussion in *Chester* and the district court's analysis in *Tooley*, this Court finds intermediate scrutiny most appropriate.  In particular, the *Chester* opinion reiterated from *Heller* that the Second Amendment, like the First Amendment,[6] offers varying degrees of protection to individuals depending on the circumstances under which the right is exercised.  *Id.* at 396.  At the "core" of the Second Amendment's protections is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* (quoting *Heller*, 128 S. Ct. at 2821).  As the *Tooley* court laid out in detail, "both in Colonial Era England and America the right to bear arms did not extend to all people . . . [instead,] limitations on the right were often based upon membership in a class perceived to be a public or private danger."  *Tooley*, 2010 WL 2380878, at *11.

In determining whether intermediate or strict scrutiny applies in this case, the Court notes that Defendant is several steps removed from the "core" of the Second Amendment's protections. First, Defendant cannot be considered "law-abiding," because he entered guilty/no contest pleas to misdemeanor resisting arrest and misdemeanor domestic battery charges in state court in June 2002. The fact that no firearm was involved in the incident precipitating those charges is of no moment. Second, neither incident named in the indictment occurred within the confines of Defendant's home.

---

[6]  For instance, the level of scrutiny applicable to political speech is stricter than that applicable to commercial speech, fighting words, or pornography.  *Compare, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198 (1992) (applying strict scrutiny to political speech), *with Central Husdon Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) (applying intermediate scrutiny to commercial speech).

The charge in Count One arises from a domestic disturbance outside of Defendant's residence. However, the firearm at issue in Count One was ultimately confiscated from a trash bag Defendant was carrying outside his home. The charge in Count Two arises from a traffic stop. Officers recovered a pistol from the glove compartment of Defendant's vehicle, and circumstantial facts indicate that the firearm was elsewhere in the vehicle or on Defendant's person prior to the stop. Third, Defendant was not using the firearms for "defense of hearth and home" in either incident. As to Count One, multiple eyewitnesses reported that Defendant was brandishing the firearm and threatening his wife, father-in-law, mother-in-law, and mother-in-law's husband. All accounts indicate that Defendant was the aggressor. As to Count Two, there is no indication that possession of the firearm was related to self defense or home defense.[7] For the foregoing reasons, the Court concludes that Defendant was not within the "core" of the Second Amendment's protections when he was arrested for violating § 922(g)(9), either time. The Court thus determines that intermediate scrutiny is applicable, and the Government carries the burden of demonstrating that its objective is an important one, advanced by means substantially related to that objective. *See, e.g.*, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (applying intermediate scrutiny and requiring "a fit between the legislature's ends and the means chosen to accomplish those ends . . . that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."); *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

---

[7] Defendant also argues that Heller "did not limit the scope of an individual's need for self defense to his home." (Mem. in Support of D.'s Motion to Dismiss 9 n.1.) While the Court does not disagree with this assertion, it notes that the "core" of the Second Amendment's protections, as defined by *Heller*, extends only to "protection of hearth and home." *See Heller*, 128 S. Ct. at 2818, 2821.

In his Motion to Dismiss and supporting memoranda, Defendant advocates for the application of strict scrutiny.  In making his argument, Defendant relies heavily on the Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago*, where the right to keep and bear arms was referred to as a "fundamental right."  *See, e.g.*, *McDonald*, 561 U.S. ___, 130 S. Ct. 3020, 3036 (2010).  Defendant correctly reiterates the Supreme Court's own words, that fundamental rights are those "so rooted in the traditions and conscience of our people as to be ranked as fundamental and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksburg*, 521 U.S. 702, 721 (1997).  While the Court agrees with Defendant that *Heller* established and *McDonald* reaffirmed a fundamental right to keep and bear arms, it disagrees with Defendant as to the scope of that fundamental right.  Defendant argues that *McDonald* establishes a blanket right to bear arms, whereby every individual has a fundamental right to firearms ownership, regardless of past convictions.  (Reply at 5.)  As with all fundamental rights, he argues, strict scrutiny applies.  According to Defendant, Mr. Smith's status as a domestic violence misdemeanant only enters the analysis once strict scrutiny is adopted, in considering whether the government's interest is compelling or whether the law is narrowly tailored to meet the government's purpose.  Regardless of the particular circumstances, then, Defendant asks this Court to find that strict scrutiny applies to all regulation of individual firearm ownership.  To support this contention, Defendant asserts that application of strict scrutiny "would still produce the *Heller* dicta disarming felons and mental defectives," apparently concluding that those subsections of § 922(g) are narrowly tailored to advance a compelling government interest, but § 922(g)(9) is not.  Interestingly, Defendant does not explain how the application of strict scrutiny to §§ 922(g)(1) and (g)(4) comports with the *Heller* Court's conclusion that those laws are "presumptively lawful."  The

18

Court disagrees with Defendant's argument that strict scrutiny applies, and finds *McDonald* instructive on the proper scope of the fundamental right guaranteed by the Second Amendment.

In *McDonald*, the Supreme Court held that the Second Amendment is fully applicable to the states by operation of the Fourteenth Amendment Due Process Clause. *McDonald*, 130 S. Ct. at 3050. The last paragraph of Justice Alito's opinion[8] reads:

> In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*.

*Id.* at 3050 (citation omitted). While Defendant is correct that the Supreme Court in *McDonald* refers to "the right to keep and bear arms" in a generic sense, it is also true that the Court repeated its restrictive holding from *Heller*:

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.

*McDonald*, 130 S. Ct. at 3047 (citing *Heller*, 128 S. Ct. at 2816, 2816-17). In defining the fundamental right, then, the Supreme Court enumerated restrictions on certain classes of

---

[8] While a majority of the Court agreed that the Second Amendment right to keep and bear arms as recognized in *Heller* applies with equal force to the states, only a plurality of the Court reached this conclusion by applying the Due Process Clause of the Fourteenth Amendment. Justice Thomas found the Second Amendment applicable to the states by operation of the Fourteenth Amendment's Privileges and Immunities Clause. *See id.* at 3058-59.

individuals—felons and the mentally ill—alongside restrictions on ownership of certain classes of weapons and firearm possession in sensitive places.  In short, the Court established a "core" of fundamental Second Amendment protections, then identified examples of circumstances and regulations that fall outside that core.  At once, the Court reassured that longstanding prohibitions were in no way doubted and that such prohibitions were "presumptively lawful."  Contrary to Defendant's assertions, a plain reading of those passages indicates to this Court that longstanding restrictions on firearm ownership and possession affecting individuals and circumstances beyond the "core" of fundamental Second Amendment protections are "presumptively lawful" and subject only to intermediate scrutiny.  As explained above, because Defendant is several steps removed from the "core" of the Second Amendment's protections, intermediate scrutiny is warranted in this case.[9]

*(2) Applying Intermediate Scrutiny, § 922(g)(9) Is Constitutional*

To pass constitutional muster under intermediate scrutiny, the Government has the burden of establishing that § 922(g)(9) serves an important government objective and is substantially related to the achievement of that objective.  *See Craig v. Boren*, 429 U.S. 190, 198 (1976).  That burden is met in this case.

The objective of § 922(g)(9) is to prevent or lessen domestic violence by deterring potential offenders and keeping firearms out of the hands of past violent domestic misdemeanants.  *See, e.g.*, 142 Cong. Rec. S8831-06 (stating the purpose of § 922(g)(9) was to "keep guns away from violent individuals who threaten their own families"); *id.* at S10377-01 ("Domestic violence, no matter how it is labeled, leads to more domestic violence, and guns in the hands of convicted wife beaters leads

---

[9]  Although the Court finds that intermediate scrutiny applies in this case, the Court makes no finding as to when strict scrutiny may apply to a firearm restriction, if ever.

to death."); *id.* at S11872, S11876 (stating that the law was enacted to ensure that, if a person with a history of domestic violence loses control again, "there will not be a gun" during "that moment of fleeting madness.").  No one doubts that preventing domestic violence and lessening the severity of any subsequent domestic violence incidents are exceedingly important government interests.  The Supreme Court has ruled that protecting the safety and lives of citizens is a compelling interest.  *See United States v. Solerno*, 481 U.S. 739, 750, 754-55 (1987).  To illustrate, at the time of § 922(g)(9)'s passage, Congress recognized that the use of guns in connection with incidents of domestic violence was an overwhelming problem.  *See* 142 Cong. Rec. 22,986 (finding that, annually, over 150,000 incidents of domestic violence involve a gun).  A more recent survey of Americans reported that "a staggering 22.1% of American women had been assaulted by an intimate partner at some point in their lifetime."  *Tooley*, 2010 WL 2380878, at * 12 (citing U.S. Dep't of Justice, Extent, Nature and Consequences of Intimate Partner Violence 11 (July 2000), *available at* http://www.ncjrs.gov/pdffiles1/nij/181867.pdf).

Section 922(g)(9) is also substantially related to the achievement of the interests stated above.  The *Tooley* court accurately described the "close fit between [Congress's] interest in preventing domestic violence and reducing its severity."  2010 WL 2380878, at *13.  The *Tooley* court's analysis makes two particularly relevant points, which this Court adopts.  First, domestic violence offenders are prone to recidivism.  Id. at *14.  Various studies and police statistics reveal that anywhere from seventeen to eighty percent of domestic violence misdemeanants recidivate.  *See* U.S. Dep't of Justice, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity 6 (2001) (seventeen percent); J.C. Babcock et al., *Does Batterers' Treatment Work? A Meta-Analytical Review of Domestic Violence Treatment*,

23 Clinical Psychol. Rev. 1023, 1039 (2004) (twenty-one percent based on police reports and thirty-five percent based on partner reports); Carla Stover, *Domestic Violence Research: What Have We Learned and Where Do We Go from Here*, 20 J. of Interpersonal Violence 448, 450 (2005) (as high as eighty percent "when victims are interviewed . . . directly").  These figures are compounded by the likely under-reporting of domestic violence.  Second, domestic violence is strongly correlated with familial homicide.  In 2005, over 800 individuals were shot and killed by intimate partners in the United States.  *See* Fox & Zawitz, Bureau of Justice Statistics, Homicide Trends in the United States (2007).  According to one study, "[a] history of domestic violence was present in 95.8% of intrafamily homicides studied."  Don B. Kates & Clayton E Kramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359 (2008).  Astonishingly, it is estimated that between forty and fifty percent of all female homicides nationwide are committed by intimate partners.  *See* Jacquelyn C. Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am. J. of Pub. Health 1089, 1089 (2003).  It is all too clear that "[f]irearms and domestic strife are a potentially deadly combination nationwide."  *Hayes*, 129 S. Ct. at 1087.  This empirical evidence illustrates that keeping firearms out of domestic violence misdemeanants' hands will accomplish the government's objective to lessen the severity of, deter, and altogether eliminate domestic violence.

Defendant contends that § 922(g)(9) cannot withstand constitutional scrutiny due to a number of defects.  In particular, he argues that § 922(g)(9) is over-inclusive in some regards, is under-inclusive in other regards, and, because of the interplay between state and federal law, constitutes a permanent ban on gun ownership for convicted domestic violence misdemeanants.

Defendant first claims that other weapons—such as bats and knives—are not restricted under the law, rendering it under-inclusive in accomplishing its objective. As the *Tooley* court aptly noted, this argument fails because, although other objects may be used as weapons in domestic violence with equal or greater frequency, only firearms are specifically "designed to swiftly and effectively deliver lethal force." *Tooley*, 2010 WL 2380878, at *15 (citing Heller, 128 S. Ct. at 2856-57). Of course, felons are likewise not prohibited from possessing baseball bats. For these reasons, the Court rejects Defendant's first argument and finds that the lethal nature of firearms justifies the specific prohibition in § 922(g)(9).

Defendant also alleges that § 922(g)(9) is over-inclusive because it bans all firearms and ammunition, and not just handguns. It is also over-inclusive, according to Defendant, because it applies everywhere, not just in the home or a vehicle. Again, the Court finds *Tooley*'s reasoning persuasive. First, while handguns are frequently used in domestic violence homicides, every firearm can deliver lethal force in a swift and effective manner. This consideration warrants Congress's choice to include all firearms in the § 922(g)(9) prohibition. Second, limiting § 922(g)(9) to a specific locality, a specific partner, or only those offenders who used a firearm in the underlying domestic incident would reduce the effectiveness of the law. Such limitations would be extremely difficult to enforce and monitor, and they overlook the restriction's purpose of eliminating a firearm from the scene of a domestic violence incident. *See Tooley*, 2010 WL 2380878, at *15. Especially considering the strikingly high rate of recidivism among domestic violence misdemeanants, the Court finds Defendant's arguments unpersuasive.

Finally, Defendant argues that, because of the difficulty of securing a pardon or expungement under either state or federal law, § 922(g)(9) operates as a complete ban on firearm ownership—in

23

perpetuity.  (Docket 55 at 1-3.)  The Court questions Defendant's characterization of the interplay between state pardon and expungement laws and federal anti-possession laws.  It is clear from the federal law that the majority of domestic violence offenders will not regain their firearms possession right.  However, there are procedures for the restoration of the right.  Namely, 18 U.S.C. § 921(a)(33)(B)(ii) excepts from the firearms ban individuals whose domestic violence convictions have been expunged, set aside, pardoned, or whose civil rights have been otherwise restored.  There is, therefore, a mechanism whereby domestic violence misdemeanants can regain their right to lawfully keep and bear arms.  It is up to state legislatures to constrict or expand the ease with which convicted misdemeanants may apply for and receive relief under these measures.

Even assuming Defendant is permanently banned from future firearm possession, the Court finds § 922(g)(9) reasonably tailored to accomplish the Government's compelling interest. Domestic violence misdemeanants are, by statutory definition, violent criminals.  *See* 18 U.S.C. § 921(a)(33)(A)(I).  In Congress's judgment and as demonstrated by social scientists, domestic violence misdemeanants are prone to repeated acts of intrafamily violence.  Past domestic violence is an indicator of future crimes of violence, and Congress legislated with that trend in mind.  Mr. Heywood is no exception.  In 2002, while "out on bond on a domestic battery charge," Defendant was arrested for allegedly striking and choking his domestic partner.  (Docket 25 at 3.)  In March 2009, Defendant was again arrested in the midst of a domestic altercation, this time while brandishing a firearm.  Defendant argues—in bold typeface—that he did not actually kill anyone during this last incident, but Defendant misses the point.  By his actions, Defendant proved what Congress found: that domestic violence misdemeanants are prone to recidivism—whether one month later or one decade later—and firearms only serve to escalate subsequent domestic violence disputes.

24

If Congress applied a ban of lesser duration, like the 180-day ban found in § 922(g)(8) and suggested by Defendant in his memoranda, the compelling purpose it enacted § 922(g)(9) to achieve would be proportionately diminished. *See Tooley*, 2010 WL 2380878, at *16 ("While limiting the deprivation of a Second Amendment right under § 922(g)(9) to a specific time period would more narrowly tailor the statute, it would also significantly lessen its effectiveness in furthering the Congressional purpose of preventing and reducing the severity of domestic violence."). In the judgment of the Court, Congress's fashioning of § 922(g)(9) is reasonably tailored to achieve not only an important interest, but a compelling one.

In his Motion to Dismiss, Defendant challenges § 922(g)(9) as applied to him and on its face. But Defendant is unable to obtain the relief he seeks. Constitutional jurisprudence instructs that, with few exceptions, a person to whom a statute properly applies will not be heard to challenge the statute on the grounds that it may conceivably be unconstitutional as applied to others. *See Salerno*, 481 U.S. at 745; *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). To succeed on his facial challenge, Defendant must show "that no set of circumstances exists under which [§ 922(g)(9)] would be valid." *Solerno*, 481 U.S. at 745. Plainly, that is not the case here, and Defendant's facial challenge to § 922(g)(9) must fail.

In holding as it does today, the Court joins with the holdings of two other district judges in the Southern District of West Virginia. Both *Staten* and *Tooley* determined that § 922(g)(9) is subject to intermediate scrutiny, citing *Heller*'s "longstanding prohibitions" language. Likewise, both *Staten* and *Tooley* held that § 922(g)(9) is substantially related to an important government interest, namely, the prevention and reduction of domestic violence involving firearms. This Court

25

joins those decisions in holding both that intermediate scrutiny is the appropriate level of constitutional scrutiny applicable to § 922(g)(9) and that § 922(g)(9) survives intermediate scrutiny.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss Counts 1 and 2 of the indictment is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        September 20, 2010

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE